**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MARY GREEN,                                          Case No. 1:11-cv-522

        Plaintiff,                                  Dlott, J.
                                         Bowman, M.J.

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff, Mary Becker, filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

In April 2009, Plaintiff filed applications for Disability Insurance Benefits (DIB) and for Supplemental Security Income (SSI), alleging a disability onset date of December 19, 2008 due to physical impairments, (Tr. 170-181), although Plaintiff later requested review of a combination of both mental and physical impairments. After Plaintiff's claims were denied initially and upon reconsideration, she requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). On February 2, 2011, an evidentiary hearing was held, at which Plaintiff was represented by counsel. (Tr. 27-68). At the hearing, Administrative

Law Judge ("ALJ") Chris McNeil heard testimony from Plaintiff, from a medical expert, and from a vocational expert.  On March 11, 2011, ALJ McNeil denied Plaintiff's applications for benefits in a written decision.  (Tr. 7-25).

Plaintiff was 38 years old at the time of her evidentiary hearing.  Plaintiff graduated from high school, but the record reflects she took "learning disabled" classes and received "help with reading." (Tr. 180).   The ALJ found that Plaintiff has the following severe impairments: "Protein S deficiency, venous insufficiency, deep vein thrombosis, lumbago, anemia, dyspnea, obesity, learning disability, and dysthymic disorder." (Tr. 12).  However, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a limited range of medium work, as follows:

> she can occasionally lift no more than a maximum of 50 pounds, frequently lift up to 25 pounds, and push or pull to the same amount using hand or foot controls.  She can walk or stand for a total of 6 hours in an 8-hour workday, with intermittent sitting throughout the day.  She can frequently stoop and crouch with flexibility in the knees and torso to lift weights at 25 to 50 pounds.  Due to mental limitations, the claimant can understand and remember simple instructions, sustain attention to complete simple repetitive tasks where production quotas are not critical, tolerate coworkers and supervisors with limited interpersonal demands in an object-focused, nonpublic work setting, and adapt to routine changes in a simple work setting.

(Tr. 15).  Based upon testimony from the vocational expert, and given Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff can perform some of her past relevant work, specifically, "as a kitchen helper and housekeeper."  (Tr. 19).  In addition, the ALJ found that there are "other jobs existing in the national economy that she is also able to perform."  (*Id.*).  Accordingly, the ALJ determined that Plaintiff was not under disability, as defined in the Social Security Regulations, and was not entitled to DIB or SSI.  (Tr. 20).

2

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the Defendant's final determination. On appeal to this Court, Plaintiff argues that the ALJ erred: (1) by failing to find that Plaintiff's cognitive impairment met or equaled Listing 12.05C; (2) by failing to give adequate weight to the RFC assessment of a nurse-practitioner; and (3) by finding Plaintiff to be "not credible."

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

Plaintiff's first claim of error focuses on Step 3 of the ALJ's analysis; specifically, his conclusion that Plaintiff does not meet or equal Listing 12.05C based upon alleged mild mental retardation.  Plaintiff's second and third claims focus more on Steps 4 and 5, and relate to the ALJ's finding that Plaintiff's RFC does not preclude her either from past relevant work, or from other jobs.  I find no error, because the ALJ's analysis is supported by substantial evidence in the record as a whole.

**B.  Plaintiff's Three Claims of Error**

**1.  Listing 12.05C**

Plaintiff first seeks reversal and an award of benefits under 12.05C.  See 20 C.F.R.

Part 404, Subpart P, Appendix 1, §12.05C.  That particular listing, which pertains to a

category of mild mental retardation, states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports on onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ...C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*Id*.

Prior to 2001, there was some ambiguity as to whether a claimant seeking to meet

or equal Listing 12.05C must not only have an IQ score of 60 through 70, but also show

"deficits in adaptive functioning" as suggested in the introductory paragraph.[1]  However, in

*Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), the Sixth Circuit clarified that a claimant is

also required to satisfy the "adaptive functioning" standard.  In *Foster*, the plaintiff had

dropped out of school after the ninth grade and had two sets of qualifying IQ scores, but

the appellate court affirmed the determination that she did not satisfy Listing 12.05 because

there was no evidence of deficits in adaptive functioning before age 22, and because the

plaintiff's prior work at a bank and a liquor store demonstrated "that she had the ability to

---

[1] Other circuits do not necessarily require a claimant to independently satisfy the diagnostic criteria in the introductory paragraph of Listing 12.05C.  *See Thomas v. Comm'r of Soc. Sec.*, 2010 WL 1254788 at *7 n.8 (N.D. Ohio March 25, 2010)(discussing differing requirements in Eighth and Ninth Circuits).

perform relatively complicated tasks." *Id.* at 355. Thus, after *Foster,* for a claimant to meet Listing 12.05, he or she "must demonstrate three factors to satisfy the diagnostic description: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations," in addition to the criteria under A, B, C, or D of Section 12.05. *See Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir.2009)(finding that the claimant's adaptive skills were not deficient because she cared for herself and her husband; cooked meals, did laundry, shopped, managed her finances; and took public transportation).

Plaintiff argues that she meets or equals Listing 12.05C on the basis of her qualifying IQ score and evidence of early and current deficits in adaptive functioning, when viewed in combination with her other severe impairments. However, the ALJ correctly determined that "[t]here is no indication that the claimant's impairments are of a level of severity necessary to satisfy the 'paragraph C' criteria of this Listing." (Tr. 15).

### A. Evidence of Valid IQ Score

The ALJ's written analysis concerning why Plaintiff does not meet Listing 12.05C is somewhat ambiguous due to the compound sentence structure of the ALJ's initial conclusion that he did not find "a valid...IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function." (Tr. 14-15, emphasis added). To refute any implicit finding that she does not have a valid IQ score, Plaintiff points to testing performed when Plaintiff was 17 years of age, which reflected a verbal scale IQ of 64, a performance IQ of 87, and a full scale IQ of 73 on the WISC-R test. (Tr. 276, 282). In addition, at the age of 27 Plaintiff was evaluated by Dale

Seifert, a master's level psychologist,[2] who noted a verbal comprehension score of 76 and a working memory score of 63. (Tr. 359).

At the evidentiary hearing, medical expert George Rogers, Ed.D. testified that the verbal comprehension and working memory scores found by Mr. Seifert are components of, but not the same as, an IQ score (Tr. 36-37). Nevertheless, Dr. Rogers opined that Plaintiff's actual IQ score would be lower than the verbal comprehension score of 76, when the components are viewed together. He estimated that Plaintiff's IQ score would be equivalent to "around 70," although he cautioned that he would be "just speculating." (Tr. 39). Despite this ambiguity, Defendant does not strongly contest the fact that Plaintiff has a valid IQ score,[3] which standing alone, falls within the qualifying range specified by Listing 12.05C. (Doc. 11 at n.6). ). Regardless, Defendant concedes that Mr. Seifert reported a full scale WAIS-IV IQ score of 70 (Tr. 359), and opined that Plaintiff's test scores would place Plaintiff at the "upper limits of  the mild mental retardation range." (Tr. 40, 360). Thus, the first element of Listing 12.05C is satisfied.

## B.  Evidence of Deficits in Adaptive Functioning

When reviewed in context, it becomes clear that the ALJ's conclusion that Plaintiff fails to meet Listing 12.05C was based primarily upon his conclusion that Plaintiff operates in "the low borderline range" rather than the mild mental retardation range, and that her "functional limitations are not severe enough to meeting Listing 12.04C." (Tr. 15). With

---

[2] Although both parties and the ALJ refer to Mr. Seifert as "Dr. Seifert," the administrative record (and the ALJ's opinion) reflect that Mr. Seifert holds a Masters degree in education, not a doctorate.

[3] Defendant briefly asserts that Plaintiff's childhood scores did not satisfy the Listing requirement because "strictly speaking" they were unaccompanied by a narrative report, (Doc. 11 at 9), but that assertion is refuted by the record. (*See* Tr. 282, narrative report describing Plaintiff as "functioning in the Borderline range.").

reference to "functional limitations," the ALJ hones in on Plaintiff's adaptive functioning.

"Adaptive functioning" involves an individual's "effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group." *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993), citing Diagnostic and Statistical Manual of Mental Disorders, pp. 28–29 (3d rev. ed. 1987). To that extent, adaptive functioning differs from "academic" functioning. *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007)(citing *Heller*, and holding that plaintiff who held a long-term, full-time job, with many activities of daily living, did not show deficiencies in adaptive functioning). "The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments...in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes*, 357 Fed. Appx. at 677, citing DSM-IV-Tr at 45.

Whether a claimant meets or equals any portion of Listing 12.05 often relies upon what evidence supports -or conversely, undermines- a finding of deficits in adaptive functioning, since many people with an IQ score lower than 70 remain capable of full-time work and therefore do not meet the Listing. *See Thomas v. Comm'r of Soc. Sec.*, 2010 WL 1254788 *8 (N.D. Ohio, March 24, 2010) (recognizing that "many individuals with mildly mental retardation are still able to work"). Ultimately, it is the claimant who bears the burden at the administrative stage of proving past and present deficits in adaptive functioning sufficient to satisfy Listing 12.05. At this judicial review stage, a plaintiff's burden is "much higher," to the extent that a plaintiff must show that the finding the ALJ

made is not supported by substantial evidence.  *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at *6 (W.D. Mich., March 26, 2012).  In contrast to the relatively uncontested issue of Plaintiff's qualifying IQ score, Defendant vigorously contests Plaintiff's position that she has proven past and present deficits in adaptive functioning.

### i. Deficits During the Developmental Period

Plaintiff argues that she has satisfied the requirement that she demonstrate adaptive deficits during the developmental period, prior to the age of 22, because the record shows that she was in "LD classes" when at school.  (Tr. 264).   In addition, Plaintiff refers to her Vineland Adaptive Behavior scores, all of which were below 70, demonstrating deficits in communication, daily living, socialization, and overall adaptive behavior. (Tr. 317). However, "[t]he Vineland Adaptive Behavior Scales is but one diagnostic tool used in assessing adaptive functioning." *Wright ex rel. K.M.W. v. Astrue*, 3:11CV-526-S, 2012 WL 1965616 at *2 (W.D. Ky. May 31, 2012).  Despite Plaintiff's relatively low Vineland scores when she was 17, education records reflect that Plaintiff's school psychologist opined that she operated in the "borderline range" of intellectual functioning.  (Tr. 282).  In June 2009, a consulting psychologist, Dr. Karen Terry, reviewed Plaintiff's records and also diagnosed borderline intellect based on childhood records of Plaintiff's functioning.  (Tr. 18, 375, 387).

In fact, no psychologist or physician has ever diagnosed with Plaintiff as mentally retarded despite her "qualifying" IQ score.  Such evidence is not conclusive, since the regulation does not *require* that a plaintiff submit proof of a formal diagnosis of mental retardation.   Nevertheless, because adaptive functioning is used to diagnose mental retardation, courts within the Sixth Circuit have considered the lack of any such diagnosis as one of several factors relevant to the determination of whether a claimant meets or

equals Listing 12.05.  *See, e.g., Hayes*, 357 Fed. Appx. at 676 (noting that no school records, and no therapist or psychologists, had ever mentioned mental retardation or intellectual deficiencies); *cf. Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007); *Daniels v. Comm'r of Soc. Sec.*, 70 Fed. Appx. 868, 873-874, 2003 WL 21774004 (6th Cir. 2003)(claimant, absent IQ scores before the age of 22, did not have required deficits where three psychologists agreed that Plaintiff was of low intelligence but not mentally retarded).

Plaintiff argues that Mr. Seifert confirmed that Plaintiff's IQ scores were "consistent" with mild mental retardation, even though he stopped short of making any diagnosis based upon a lack of evidence concerning Plaintiff's level of adaptive functioning  (Tr. 360).  Dr. Rogers also testified, based on the Vineland scores, that Plaintiff exhibited adaptive deficits in the developmental period that were "a little lower" than the current IQ scores found by Mr. Seifert.  (Tr. 39).

While the evidence of adaptive functioning during the developmental period is close in this case, I conclude that the record as a whole reflects that Plaintiff's functional level exceeded that required by Listing 12.05C when Plaintiff's adult level of adaptive functioning is considered.

### ii.  Current Adaptive functioning

During the consultative psychological examination conducted by Mr. Seifert, Plaintiff reported that she cooked, shopped with her husband, budgeted her money, and enjoyed her daughter and her activities.  (Tr. 359, see also Tr. 18, 542).  Plaintiff has a driver's license, which she obtained after passing a written test.  (Tr. 193).  She leaves her home to get blood drawn weekly, and attends doctor's appointments.  (Tr. 193, 542).  Plaintiff

testified that she bathes and dresses herself, and she is raising her daughter.

Plaintiff's work experience similarly fails to show the type of current adaptive deficits required to meet Listing 12.05C. Plaintiff has consistently found employment in menial jobs. She has worked successfully for relatively long periods of time in factories, as a dishwasher, and as a janitor. (Tr. 163-164, 545). Dr. Terry, the non-examining consultant, also noted Plaintiff's mental ability to perform household responsibilities and "long work history." (Tr. 387). She specifically noted that during that employment, Plaintiff alleged needing help only based upon physical limitations, not mental limitations, and that Plaintiff had continued employment without apparent difficulty or complaint other than those relating to her alleged physical symptoms. (*Id.*). Based on the record, she opined that Plaintiff could "understand, remember, and carry out one-to-two step tasks," adapt to routine changes in the work environment, and "get along with supervisors and coworkers on at least a superficial basis." (*Id.*). A second reviewing psychologist, Dr. Dawkins, affirmed that assessment in August 2009. (Tr. 410).

In short, there is no evidence that Plaintiff did not work because of her mental impairment, or that she was not mentally capable of performing the jobs that she once held. *Accord Hayes*, 357 Fed. Appx. at 676. To the contrary, she reported that she "got along ok with supervisors and coworkers and was a reliable worker." (Tr. 357). Plaintiff also has sustained long social relationships - she is married, enjoys her daughter, and regularly visits with other family members. *See also Jenkins v. Comm'r of Soc. Security*, 1:06cv552-SJD, 2008 WL 339790 (S.D. Ohio Feb. 6, 2008)(plaintiff who performed own personal care, drove, walked, shopped, did household chores and cared for young child did not demonstrate deficits in adaptive functioning).

11

Finally, as previously mentioned, Dr. Rogers opined in January 2011 that Plaintiff functioned in the low borderline range.  (Tr. 541, 545).  He found only mild restrictions in Plaintiff's activities of daily living and in maintaining social functioning, and only moderate difficulties in maintaining concentration, persistence, and pace (Tr. 542).  At the evidentiary hearing, he testified that his pre-hearing opinion -that Plaintiff did not meet Listing 12.05, based upon her level of functioning- had not changed.  (Tr. 35).

The ALJ's determination that Plaintiff did not have "marked" restrictions in the referenced areas (pertinent to Listing 12.05D) only adds to the conclusion that Plaintiff does not have current restrictions in adaptive functioning.  *Accord West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. at 699 (concluding that psychological evaluation that found claimant able to understand and retain simple instructions and maintain concentration and attention necessary to complete basic tasks "indicates that West did not exhibit deficiencies in adaptive functioning, and thus supports the ALJ's conclusion that West did not meet or equal Listing 12.05(C).").

Plaintiff disputes very little of the evidence concerning her level of adaptive functioning that was relied upon by the ALJ to support his conclusion that Plaintiff does not meet or equal Listing 12.05C.  Her lengthy work history stands for itself, but Plaintiff does point out that she testified at the evidentiary hearing that she needed help with paperwork while she was employed because she did not understand anything.  (Tr. 53).  However, a review of the transcript reflects that Plaintiff testified that she needed help with paperwork only when she was employed at SHOWA in an office and initially asked to do "testing" as part of her job.  (Tr. 53-54).  By contrast, she testified that she was able to learn the job after receiving assistance.  (Tr. 54).   Therefore, even this evidence arguably supports

12

rather than undermines the ALJ's finding that Plaintiff does not have deficits in adaptive functioning sufficient to meet Listing 12.05 for mild mental retardation.

In lieu of any serious dispute concerning the factual evidence relating to her adaptive functioning as an adult, Plaintiff argues for a more favorable interpretation of that evidence based upon two Sixth Circuit cases. First, she compares herself favorably to the claimant in *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991), in which the Sixth Circuit reversed an ALJ's conclusion that a plaintiff did not meet or equal Listing 12.05C based upon his activities of daily living. The Sixth Circuit in *Brown* noted that plaintiff's ability to use public transit and visit friends, ability to make change at a grocery store, limited ability to do laundry and clean his room, completion of the sixth grade, limited reading comprehension, work history and possession of driver's license, all failed to constitute substantial evidence to support the ALJ's rejection of an IQ score of 68.

It is worth noting that *Brown* was decided long before the emphasis on adaptive functioning highlighted in *Foster*. In addition, unlike the plaintiff in *Brown,* in this case Plaintiff graduated from high school. Unlike *Brown*, this record contains several psychological opinions that Plaintiff has "borderline intellectual functioning," with no mental health professional offering a different opinion.[4]

The second case on which Plaintiff relies is more recent, but unpublished and equally distinguishable. In *Dragon v. Comm'r of Soc. Sec.*, 2012 WL 987758 (6th Cir., March 26, 2012), the plaintiff's full-scale IQ score of 50 was twenty points lower than Plaintiff's score in this case, suggesting that the claimant was "moderately retarded."

---

[4] Dr. Fritzhand, who is not a mental health professional and who conducted no intelligence testing, indicated that Plinatiff's level of intellectual functioning was "normal," but the ALJ did not rely on that opinion.

However, the ALJ concluded that Dragon did not meet Listing 12.05 after finding that the IQ scores were invalid, because the examiner had noted that they were lower than expected. *Id*. at *3.  The Sixth Circuit reversed and remanded for an immediate award of benefits under Listing 12.05.[5]  The appellate court found that Dragon had presented "significant" evidence of deficits in adaptive functioning, including similar low IQ scores at age 12 that the ALJ improperly ignored, and a host of other validating school records.  The Sixth Circuit held that substantial evidence did not exist to invalidate the IQ scores.

Aside from the fact that the court was focused on the issue of when an ALJ can invalidate IQ scores, *Dragon* is distinguishable because there, the plaintiff presented ample evidence of deficits in adaptive functioning.  In addition, unlike *Dragon*, in this case Plaintiff's IQ scores are at the very top of the "mild" retardation range.  Last, while it is true that the plaintiff in *Dragon* attempted to work in menial jobs, her work history was far less successful than the Plaintiff in this case.

Plaintiff's failure to meet her burden to show deficits in adaptive functioning is not uncommon, as a broader review of the case law demonstrates.  *See generally Carrico v. Comm'r of Soc. Sec.*, 2011 WL 646843 at *9-10 (N.D. Ohio Jan. 21, 2011)(R&R holding that claimant showed no adaptive functioning limitations based on past employment history and ability to care for young child, clean, cook, drive, shop, sew, and perform household chores), adopted 2011 WL 680153 (Feb. 16, 2011); *Harris v. Comm'r of Soc. Sec.*, 2010 WL 749654 (S.D. Ohio March 1, 2010)(no evidence that deficits in adaptive functioning manifested before age 22, even though 46 year old claimant in special education classes

---

[5] Judge Boggs dissented from the portion of the opinion that determined benefits should be awarded, explaining that he would remand for further fact-finding concerning the "close and contested issue" of whether Dragon was "'of borderline intellectual functioning as opposed to mentally retarded.'" *Id*. at 12.

had limited ability to read, had lived with his mother for most of his life, had never worked a regular job, shopped only with his mother, and did not like to be around people, but was able to do dishes, sweep, and do laundry); *Renn v. Comm'r of Soc. Sec.*, Case No. 1:09-cv-319-SSB, 2010 WL 3365944 (S.D. Ohio, Aug. 24, 2010)(remanding on other grounds, but affirming that Plaintiff did not meet Listing 12.05 where IQ score within "mildly retarded" range, but "Plaintiff's daily activities, prior work history, and completion of high school show that she does not have deficits in adaptive functioning."); *Carter v. Comm'r of Soc. Sec.*, *supra* at *5-6 (affirming based upon evidence showed that the plaintiff had "adaptive skills which had allowed her to be employed in unskilled occupations for many years." ); *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. at 698 (affirming denial of listing where claimant with low IQ scores and diagnosis of borderline intellectual functioning did not show deficiencies in adaptive functioning); *Daniels v. Comm'r of Soc. Sec.*, 70 Fed. Appx. 868 (affirming denial of benefits under Listing 12.05 where claimant had current low IQ score, but psychologist observed she clinically appeared to function at a higher level, and lack of evidence presented by plaintiff coupled with evidence of work history and graduation from high school supported determination that claimant did not exhibit required deficits in adaptive functioning); *see also Foster, supra* (deficits not shown based upon work history).

As in *Hayes*, the record supports Plaintiff's claim that she suffers from subaverage intellectual functioning, but the record also fairly supports the ALJ's conclusion that her functioning falls in the range of borderline intellectual functioning rather than the more severe range of mental retardation. Although some factually similar cases can be found that differ in outcome, the ALJ's decision therefore falls within the acceptable "zone of choice."

15

### 2.  Plaintiff's Functional Capacity

Plaintiff's second and third claims of error both relate to the determination of her RFC.  Plaintiff argues that the ALJ erred in Steps 4 and 5 of the sequential analysis in two respects: (1) by failing to adopt the RFC opinions of a nurse-practitioner; and (2) by failing to fully accept Plaintiff's own testimony.

### A.  The RFC opinion of Diane Bourchect, CNP

Plaintiff first complains that the ALJ erred in giving "less weight" to the RFC opinion of Diane Bourchect, CNP.  In general, only a medical doctors or a licensed psychologist is considered to be an "acceptable medical source."  *See* 20 C.F.R.  §404.1527(a)(2).  However, Social Security Ruling 06-3p states that "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source...if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.'" *Id.,* 2006 WL 2329939.  Plaintiff argues that because Nurse Bourchect was in the same practice group as treating physician Dr. Catherine LaRuffa, the physical RFC form she completed on December 29, 2010 should have been given more weight.  (Tr. 547-551).  In the RFC form, Nurse Bourchect limited Plaintiff to less than sedentary work based upon shortness of breath and chronic back pain, among other physical conditions, and opined that Plaintiff is incapable of even "low stress" jobs.  (Tr. 548-551).  The basis for the latter conclusion was Plaintiff's subjective report that she "cannot remember much."  (Tr. 548).

The Court finds no error in the ALJ's rejection of Nurse Bourchect's opinion.  The ALJ correctly stated that Nurse Bourchect was not considered an "acceptable medical

source," (Tr. 18), but nevertheless considered her opinions.  He explained that he was giving less weight to those opinions because they were "not supported by the objective medical evidence of record, [were] inconsistent with treating source records, and [were] not consistent with the credible portion of the activities of daily living evidence." (*Id*.).  The reasons stated by the ALJ are supported by the record.  Ms. Bourchect's opinion reflects she made no clinical findings and found no objective signs relating to Plaintiff's complaints of chronic back pain and shortness of breath.  (Tr. 547).  She also stated that Plaintiff's impairments were not "reasonably consistent with the symptoms and functional limitations described in this evaluation," because Plaintiff's reported pain was "greater than physical exam." (*Id*.).  While Nurse Bourchect opined that Plaintiff's depression negatively impacted her physical condition, the ALJ was entitled to consider the fact that Plaintiff has never received regular treatment for depression (Tr. 356, 258, 387, 548).

### B. Credibility Analysis

As her last assignment of error, Plaintiff argues that the ALJ improperly evaluated her credibility.  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Further, a credibility determination cannot be disturbed "absent a compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence.  *Warner v. Comm'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

17

Plaintiff argues that the ALJ erred in finding her "not credible," based in part on the fact that the testimony "given by the Plaintiff at the hearing was based primarily on leading questions particularly with respect to her mental limitations, such that the answers given were less than reliable because they were suggested by claimant's representative." (Tr. 17). Plaintiff protests because it is "permissible" to ask a witness leading questions in a non-adversarial social security hearing, since "the traditional reasons for distrusting testimony elicited by leading questions are absent." *Anderson v. Soc. Sec. Admin.*, 2008 WL 4442547 (M.D. Tenn., R&R Sept. 10, 2008, adopted with modification at 2008 WL 4442546), quoting *Shriver v. Chater*, 62 F.3d 1429, 1995 WL 454710 at *3 (10th Cir. 1995)

Even though traditional evidentiary rules do not apply in social security proceedings, that does not mean that the ALJ was wholly prohibited from considering the format of the questions and Plaintiff's responses as one of several factors in evaluating Plaintiff's credibility in this case. More importantly, Plaintiff fails to acknowledge the multiple additional reasons cited by the ALJ for his credibility finding, including the fact that two consulting physicians found that Plaintiff was not disabled and was not as limited as Plaintiff claimed to be by her back pain. (Tr. 17).

The ALJ discussed the fact that "[t]he objective medical evidence is not consistent with the claimant's subjective allegations about the nature and severity of her pain." (Tr. 16). For example, although Plaintiff reported a "pinched nerve in her lower back," a September 2010 lumbar spine MRI "showed no evidence of disc herniation, spinal stenosis, or neural impingement." (Tr. 16, 193, 469, 483). X-rays also were essentially normal. (Tr. 370, 425, 469). A consultant, Dr. Manos, also opined that Plaintiff was only partially credible, noting that her alleged need to use a wheelchair was not supported by

18

examination findings or other records.  (Tr. 193, 411, 413, 453).  Even Plaintiff's own treating physician, Dr. LaRuffa, did not specify any work-related limitations caused by Plaintiff's impairments.  (Tr. 320, 404).  In fact, Dr. LaRuffa noted that Plaintiff sought no primary care treatment for more than four years, from August 2004 to December 2008, which the ALJ cited as evidence "that her impairments are not as severe as alleged."  (Tr. 17, 319).  Plaintiff described her low back pain as "intermittent" in December 2008 and as "occasional" in May 2009.  (Tr. 322, 367).  She reported her back was "better" in November 2010 and that she planned to move to assume care for her father-in-law at that time.  (Tr. 464).  Similarly, she did not seek therapy for leg pain until May 2010 and later reported that her legs felt better.  (Tr. 529).

The ALJ also referenced records that reflected that Plaintiff ambulated with normal gait, was comfortable in both the sitting and supine positions, and had a normal neurological exam, (Tr. 16, 368-369).  He noted the absence of any "inpatient or Emergency Room treatment records" to support Plaintiff's allegation of disabling shortness of breath.  (*Id*.).  Other medical records also reflected that Plaintiff had non-labored respirations and good breath sounds.  (Tr. 414, 432, 453).  While an ALJ may not rely solely on a lack of objective evidence to reject claims of disabling pain, it was not error for the ALJ to consider the lack of objective medical evidence as one factor to be considered. *See* 20 C.F.R. §404.1529(c)(2) and (c)(3)(setting forth relevance of treatment a claimant has received for relief of her symptoms when evaluating pain and functional limitations).

Last, the ALJ noted inconsistencies in the record concerning Plaintiff's report of her activities of daily living, which suggested "testimonial exaggeration of symptoms."  (Tr. 17). In contrast to her testimony at the hearing, Plaintiff reported to the agency on May 8, 2009

that she relocated to take care of her father-in-law, could leave the house, visited her mother-in-law weekly, cooks simple meals, and shops for groceries.  (Tr. 16-17, 193-94, 464).  She also reported to Mr. Seifert that she could cook, budget her money, and enjoyed participating in activities with her daughter (Tr. 359).  In nearly all cases, an evaluation of a claimant's daily activities is relevant to the evaluation of subjective complaints and ultimately, to the determination of disability.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d at 392 ("The administrative law judge justifiably considered Warner's ability to conduct daily life activities in the face of his claim of disabling pain."); *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 536 (6th Cir. 2001)(ALJ may consider claimant's testimony of limitations in light of other evidence of claimant's ability to perform tasks such as walking, going to church, going on vacation, cooking, vacuuming and making beds).  In addition to Plaintiff's reported daily activities, the ALJ carefully considered the clinical records and objective evidence, all of which failed to support Plaintiff's allegations of disabling pain.

As other courts have noted, many people experience chronic pain that is less than disabling.  *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 230-231 (6th Cir. 1990)(affirming ALJ's determination that back pain from nerve root compression and herniated disc, coupled with degenerative changes, was not disabling).  Considering the record as a whole, substantial evidence supports the ALJ's credibility assessment in this case.

### III.  Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**, and that this case be **CLOSED.**

20

_/s Stephanie K. Bowman_____
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARY GREEN,                                        Case No. 1:11-cv-522

        Plaintiff,                              Dlott, J.
                                                   Bowman, M.J.

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).